1

2

3

4

5

6

7          **IN THE UNITED STATES DISTRICT COURT FOR THE**

8                **EASTERN DISTRICT OF CALIFORNIA**

9

10    **DEON WADE,**                          )    **1:09-CV-0599 AWI-BAM**
                                              )
11                    **Plaintiff**,          )    **MEMORANDUM OPINION**
                                              )    **AND ORDER ON**
12          **v.**                            )    **DEFENDANTS' MOTION FOR**
                                              )    **SUMMARY JUDGMENT**
13    **FRESNO POLICE DEPARTMENT,**            )
      **et al.,**                             )    (Doc. No. 75)
14                                            )
                      **Defendants**.         )
15                                            )
                                              )
16    _____ )

17

18          This civil rights action arises from the detention and arrest of Plaintiff Deon Wade

19    ("Plaintiff" or "Wade") by Fresno Police Officers Frederick[1] Williams ("Williams"), Bernard

      Finley ("Finley"), David Wilkin ("Wilkin"), and Haywood Irving ("Irving") (collectively,

20    "Defendants") for drinking in public, providing false information to a police officer to prevent

21    arrest, resisting arrest, and battery on a peace officer.  Plaintiff, a prisoner proceeding pro se and

22    in forma pauperis, brought suit in this Court under 42 U.S.C. § 1983 alleging he was unlawfully

23    arrested and subjected to excessive force.  On June 8, 2010, the Court dismissed Plaintiff's state

24    law and Eighth Amendment claims.  See Court's Docket Doc. No. 40.   The Court also

25

26    _____

27          [1]In the style of the case, this officer is identified as "Fredrick."  In the briefing to this
      Court and in the signature block of Mr. Williams' declaration in support of Defendants' motion,
28    Defendants refer to him as "Frederick"  Of the two options available to the Court, it will follow
      the lead of Defendants and use "Frederick."

1    dismissed the Fresno Police Department from the action and granted Plaintiff leave to amend his

2    complaint to add the City of Fresno as a Defendant.  See id.  On August 31, 2010, Plaintiff gave

3    notice that he would not be amending his complaint and wished to proceed against the remaining

4    officer Defendants. See id. at Doc. No. 47.   The only remaining causes of action are Plaintiff's

5    allegations of excessive force under the Fourth and Fourteenth Amendments.   Defendants now

6    move for summary judgment and/or qualified immunity.  For the reasons that follow,

7    Defendants' motion will be denied in part and granted in part.

8                                   **I. FACTUAL BACKGROUND**

9    **A.      Evidentiary Issues**

10          Defendants object to certain documentary and testimonial evidence presented by Plaintiff

11   in support of his opposition to the summary judgment motion.[2]  The Court will address each

12   piece of evidence in turn.

13          1.      Jones and White Declarations

14          Defendants argue that the Declaration of Lamont White, along with the Declaration of

15   Camilla/Camella Jones,[3] are inadmissible because Plaintiff did not disclose them during

16   discovery.  During Plaintiff's deposition on September 17, 2010, he testified that he no longer

17   had a friendship with Lamont White, no longer communicated with Mr. White, and did not know

18   where Mr. White resided.  See Pl.'s Depo. at 76:9-15.  Plaintiff was also asked if he knew of any

19   witnesses who saw what happened. Id. at 98:19-20. Plaintiff identified only "Shamika" and "a

20   little kid" named "Augie."  Id. at 98:21, 99:13-21.  Defendants also propounded special

21

---

22   [2] Defendants have also submitted evidence of what they refer to as "Plaintiff's Prior Bad
     Acts."  Wade did not object to this evidence, but the Court will address it here.  Defendants
23   contend this evidence is admissible under Federal Rules of Evidence 404(b) and 406 because it
     goes to Wade's motive, intent or habit.  The Court finds that the probative value of the prior bad
24   acts evidence is outweighed by the danger of unfair prejudice.  The Court will not consider the
     prior bad acts evidence on Defendants' motion for summary judgment. See Fed. R. Evid. 403;
25   Fed. R. Civ. P. 56(c); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002); Beyene v.
     Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

26
     [3] The Jones Declaration is handwritten and somewhat difficult to read. The declarant's
27   first name appears to be spelled "Camella" in the introductory paragraph, and "Camilla" in the
     signature block.  See Court's Docket, Doc. No. 78 at 42-43.  Two other defense witnesses
28   testified about a neighbor named "Carmella."  See C. Sandoval Depo. at 14:12-18; Reynolds
     Depo. at 9:3-15.  In his surreply, Plaintiff also refers to Ms. Jones as "Carmella."  See Court's
     Docket, Doc. No. 85.  Apparently, Defendants have also discovered that Ms. Jones' last name is
     in fact "Cox."  See Court's Docket, Doc. No. 86 at n.1.

1    interrogatories requesting that Plaintiff identify all documents and individuals with knowledge of

2    the facts supporting his contentions.  See Suppl. Camarena Decl., Ex. I.  On November 30, 2010,

3    Plaintiff responded to each special interrogatory as follows: "After a reasonable search and

4    diligent inquiry, Responding Party does not have information responsive to this request."

5    Nevertheless, Plaintiff attached to his opposition brief the White Declaration, dated October 27,

6    2010, and the Jones Declaration, dated December 7, 2010.  See Doc. No. 78, Exs. A, G.  Federal

7    Rule of Civil Procedure 26(a) requires initial witness disclosures, and Rule 26(e) requires that a

8    party supplement his initial disclosures and discovery responses if he learns that in some material

9    respect the disclosure or response is incomplete or incorrect.  Federal Rule of Civil Procedure

10   37(c)(1) provides: "If a party fails to provide information or identify a witness as required by

11   Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence

12   on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

13        The Court directed Plaintiff to provide additional briefing explaining his failure to

14   disclose the White and Jones Declarations and witness contact information to the defense.  See

15   Court's Docket, Doc. No. 83.  Plaintiff responded that he received the declarations in a letter

16   from a family member sometime in May 2011.  He explained that the letter requested that the

17   addresses for White and Jones be withheld "due to fear of retaliation by the Fresno Police

18   Department."  This does not provide substantial justification for failing to disclose at least the

19   declarations after he purportedly received them in May 2011 and prior to using them as evidence

20   to support his opposition to the instant motion.  The obligation to supplement discovery

21   responses pursuant to Rule 26(e) is continuing in nature.  Although Defendants learned through

22   other discovery that Mr. White and Ms. Jones were potential witnesses, their efforts to locate Mr.

23   White and Ms. Jones were unsuccessful.  Defendants further contend they were unaware of the

24   allegations in the White and Jones declarations until Plaintiff filed his opposition to the instant

25   motion.  The failure to disclose the declarations was not harmless because Defendants were

26   deprived of the opportunity to cross examine Mr. White or Ms. Jones in deposition, or to

27   otherwise challenge the allegations set forth in the declarations.  Thus, pursuant to Rule 37(c)(1),

28   the Court will not consider the White or Jones Declarations in deciding Defendants' motion for

1   summary judgment.

2          In addition to the failure to disclose, Defendants argue the White and Jones declarations

3   are inadmissible and cannot be considered by the Court in ruling on a summary judgment motion.

4   See Fed. R. Civ. P. 56(c); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002); Beyene v.

5   Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).  Defendants contend that

6   Plaintiff has failed to authenticate the declarations.  In the Ninth Circuit, "[i]t is well-settled that

7   unauthenticated documents cannot be considered on a motion for summary judgment."  Canada

8   v. Blain's Helicopters, 831 F.2d 920, 925 (9th Cir. 1987) (citing Hamilton v. Keystone Tankship

9   Corp., 539 F.2d 684, 686 (9th Cir. 1976)); see also Orr, 285 F.3d at 773; Cristobal v. Siegel, 26

10  F.3d 1488, 1494 (9th Cir. 1994); Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d

11  1542, 1550-51 (9th Cir. 1989); Beyene, 854 F.2d at 1182.

12         Authentication is a "condition precedent to admissibility," and this condition is satisfied

13  by "evidence sufficient to support a finding that the matter in question is what its proponent

14  claims."  Fed. R. Evid. 901(a).  A proper foundation can be established through an affidavit made

15  on personal knowledge that meets the requirements of Federal Rule of Civil Procedure 56(e).

16  See Orr, 285 F.3d at 774; Fed. R. Civ. P. 56(e).  Alternatively, documentary evidence can be

17  authenticated under Federal Rule of Evidence 901(b)(1) by a witness who wrote it, signed it, or

18  saw others do so; or as a self-authenticating document without extrinsic evidence under Federal

19  Rule of Evidence 902.  See id. at 774; Fed. R. Evid. 901(b); Fed. R. Evid. 902.

20         Here, Plaintiff asserts he received the White and Jones Declarations in a May 2011 letter

21  from an unidentified family member.  Plaintiff did not submit the letter as evidence.  The White

22  Declaration is typewritten and purports to be signed by Lamont White under penalty of perjury

23  on October 27, 2010.  The Jones Declaration is handwritten and purports to be made by Camilla

24  Jones under penalty of perjury on December 7, 2010.  The declarations are neither notarized nor

25  witnessed, and they bear no indicia of where they were signed.  Plaintiff has not laid an adequate

26  foundation to authenticate the White and Jones declarations, and they cannot be relied upon to

27

28

4

defeat a motion for summary judgment.[4]

In sum, the White and Jones Declarations submitted in support of Plaintiff's opposition to the motion for summary judgment were not properly disclosed to the defense, and are inadmissible because they lack foundation.  The Court will not consider the declarations on summary judgment.

2.    Criminal Case Documents

Plaintiff has also attached to his opposition two documents it appears were filed in the Superior Court of California in the criminal case arising out of the underlying events in this case. The first purports to be the October 31, 2008 Declaration of Attorney Jane Boulger in support of a motion to suppress evidence.  See Court's Docket, Doc. No. 78, Ex. B.  The second purports to be a motion to suppress evidence filed by Ms. Boulger on behalf of Mr. Wade on October 31, 2008.  See id., Ex. C.  Defendants object to the use of these documents on the grounds that they are hearsay, draw legal conclusions, do not take all the facts into consideration, and contain biased opinions.  To the extent Plaintiff is relying on these documents for the truth of the matters asserted therein, the Court agrees those documents are inadmissible hearsay.  See Fed. R. Evid. 801(c); Fed. R. Evid. 802.  Plaintiff has not laid a foundation for any exception to the hearsay rule.  See Fed. R. Evid. 804. The Court will therefore not consider the two criminal case documents in deciding the motion for summary judgment.

3.    Toxicology Report

Defendants object to a copy of a toxicology report attached to Plaintiff's opposition.  See Court's Docket, Doc. No. 78, Ex. I.  The report appears to be from "Central Valley Toxicology,

---

[4] Plaintiff filed a "Response to Defendants' Response to Plaintiff's Surreply" stating that the White and Jones declarations are genuine.  See Court's Docket, Doc. No. 89.  This too is insufficient to authenticate the declarations.  Plaintiff objects to defense counsel's attempts to contact Jones and White, and argues that he was not allowed to attend the defense witness depositions.  However, it is a fundamental rule that an incarcerated plaintiff has no constitutional right to attend any proceedings in his civil action.  See Hernandez v. Whiting, 881 F.2d 768, 770 (9th Cir. 1989) ("imprisonment suspends the plaintiff's usual right to be personally present at judicial proceedings brought by himself or on his behalf"); McKinney v. Boyle, 447 F.2d 1091, 1094 (9th Cir. 1971) ("When the plaintiff in a civil suit is confined in a state prison at the time of a hearing, he has no right to appear personally.") (citing Potter v. McCall, 433 F.2d 1087 (9th Cir. 1970));

5

1   Inc" and was signed by "Alan D. Barbour, Analyst" on April 29, 2008.  It appears to contain the

2   results of an "Ethyl Alcohol & Abuse Screen" requested by the Fresno City Police Department

3   for a blood sample labeled "Wave,[5] Dion, Fresno PD, 08-34932 4-25-08; 2147; M Jaeckel."  The

4   "Results" section of the report states: "Blood Ethyl Alcohol = Negative; Ethyl Alcohol analysis

5   performed and recorded on 04/28/28; Blood Abuse Screen: Cocaine, Opiates, PCP &

6   Methamphetamine by Immunoassay = Negative; Note: Additional testing available upon

7   request."  Defendants argue the toxicology report lacks foundation, calls for hearsay, and calls for

8   expert medical opinion.

9            As discussed above, only admissible evidence may be considered by the trial court in

10  ruling on a motion for summary judgment.  See Beyene, 854 F.2d at 1182.  Authentication is a

11  "condition precedent to admissibility," and this condition is satisfied by "evidence sufficient to

12  support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).

13  A proper foundation can be established through an affidavit made on personal knowledge that

14  meets the requirements of Federal Rule of Civil Procedure 56(e).  See Orr, 285 F.3d at 774; Fed.

15  R. Civ. P. 56(e).  Alternatively, documentary evidence can be authenticated under Federal Rule

16  of Evidence 901(b)(1) by a witness who wrote it, signed it, or saw others do so; or as a self-

17  authenticating document without extrinsic evidence under Federal Rule of Evidence 902.  See id.

18  at 774; Fed. R. Evid. 901(b); Fed. R. Evid. 902.

19           In an unpublished opinion, the Ninth Circuit held that a district court erred by admitting a

20  toxicology report without proof that the blood sample was drawn from the defendant through

21  admissible evidence regarding the person(s) who actually drew and transmitted the blood to the

22  lab.  See Taylor v. City and County of San Francisco,166 F.3d 344, 1999 WL 23141, *3 (9th Cir.

23  1999).  Here, Plaintiff has presented no evidence tending to show that the report is what he

24  claims, for example, through an affidavit of the person who signed the report, or the person who

25  drew his blood.  Thus, the report is not admissible and the Court will not consider it in deciding

26

27            [5] In his deposition, Mr. Wade testified that his surname is spelled "Wave" on his
    California Identification Card due to a misspelling on his birth certificate.  Wade Depo. at 17:16-
28  24.

6

1    the instant motion.

2        Moreover, even if Plaintiff had presented sufficient evidence to authenticate the

3    toxicology report, it is hearsay.  In opposition to Defendants' motion, Plaintiff cites the

4    toxicology report for the proposition that Plaintiff tested negative for drugs as well as alcohol.

5    The report is therefore an out-of-court statement offered for the truth of the matter asserted

6    therein.  See Fed. R. Evid. 801(c); Fed. R. Evid. 802.  Plaintiff has not laid a foundation for any

7    exception to the hearsay rule, and the report is therefore inadmissible.  See Fed. R. Evid. 804.

8        4.    Jackson Letter

9        Plaintiff also submitted a letter dated September 21, 2010 letter addressed to Shamika

10   Jackson in support of his opposition to Defendants' motion.  See Court's Docket, Doc. No. 78,

11   Ex. J.  The letter is from Defendants' attorney, and discusses re-noticing a deposition.  The letter

12   notes that Ms. Jackson was paid a witness fee to appear at the deposition.  Plaintiff cites this

13   letter in support of the assertion that "the defendant paid witnesses to give contradicting

14   depositions different from their original statements." As a matter of law, all non-party witnesses

15   who are subpoenaed to give deposition testimony are required to be paid a witness fee.  See  28

16   U.S.C. § 1821.  Neither Plaintiff nor Defendants has submitted any testimony from Ms. Jackson

17   in support of their arguments on summary judgment.  Thus, even viewing the letter in the light

18   most favorable to Plaintiff, the letter does not create an issue of disputed fact.

19

20   **B.    Defendants' Undisputed Material Facts**[6]

21       On Friday, April 25, 2008, Defendants Williams and Finley, City of Fresno police

22   officers, were working a double unit patrolling the Pinedale area of Fresno.  See DUMF No. 1;

23   Williams Decl. at ¶ 6; Finley Decl. at ¶ 7.   During the preceding days, the City of Fresno Police

24   Department had received numerous reports of home invasions and burglaries in this area of

25

26       [6] "DUMF" refers to Defendants' Undisputed Material Facts.  See Court's Docket, Doc.
     No. 75-1.  "PRDUMF" refers to Plaintiff's Response to Defendants' Undisputed Material Facts.
27   See Court's Docket, Doc. No. 78 at 18-27.  The Court notes that the two sides in this case allege
     sharply divergent facts.  On summary judgment, the Court will construe any ambiguities in the
28   light most favorable to Wade, the non-moving party.  See Stegall v. Citadel Broad, Inc., 350 F.3d
     1061, 1065 (9th Cir. 2003).

Fresno.  See DUMF No. 2; Williams Decl. at ¶ 6; Finley Decl. at ¶ 7.  At approximately 6:10

p.m. Officers Williams and Finley observed Wade and another subject openly drinking beer in

the front yard of 232 W. Locust, approximately 1 foot away from the street curb.  See Williams

Decl. at ¶ 7; Finley Decl. at ¶ 8.  Wade does not dispute that he and Lamont White were on the

front porch of White's home at 232 W. Locust Street, but maintains that he was not drinking at

all and was nowhere near the street curb.[7]  See PRDUMF No. 1, Court's Docket, Doc. No. 78 at

18; Wade Decl. at ¶ 1; Wade Depo. at 39:17-25.  Officers Williams and Finley drove past 232 W.

Locust and claim they observed Wade and White in their rear view mirrors continuing to drink

beer openly near the street.  See Williams Decl. at ¶ 7; Finley Decl. at ¶ 8.  The officers then

turned their patrol car around, went back to the residence and parked in front of the home to

investigate the matter.  See DUMF No. 5; Williams Decl. at  ¶ 8; Finley Decl. at  ¶ 9.

    Meanwhile, Defendants Wilkin and Irving, another double unit, as well as Sergeant Beer,[8]

were dispatched to 232 W. Locust to assist.  See DUMF No. 6; Wilkin Decl. at  ¶ 6; Irving Decl.

at  ¶ 6.  Upon parking the patrol vehicle, Officers Williams and Finley saw Wade immediately

walk inside the residence with his beer.[9]  See Williams Decl.  at  ¶ 9; Finley Decl.  at  ¶ 10.

Officers Williams and Finley stepped out of their patrol car, asked White if it was okay to talk to

him, and White said, "Yes."  See DUMF Nos. 8, 9; Williams Decl.  at  ¶ 10; Finley Decl.  at  at  ¶

12.  White stated that he lived at the location and was just having some beer with a friend,

referring to Wade.  See DUMF No. 10; Williams Decl. at ¶ 10; Finley Decl. at ¶ 12.  Officer

Williams went to the front door to make contact with Wade, who was standing at the opened

[7] Defendants counter with the testimony of Dr. Chad Kahwaji, MD, the physician who treated Wade when he arrived at Community Regional Medical Center on April 25, 2008.  Dr. Kawahji stated that his clinical impression was that Mr. Wade was "positive for ETOH [alcohol]" and that Mr. Wade told him he was drinking alcohol.  See Kahwaji Depo. at 24:6-10.  For purposes of summary judgment, the Court will accept Mr. Wade's version of events, but notes that the issue of whether Mr. Wade was drinking when Defendants Williams and Finley observed him in the front yard of 232 W. Locust is not material to determine the excessive force claims at issue in this motion.

[8] Wade disputes that Sergeant Beer responded to the location, but offers no evidence to support his contention.  See PRDUMF No. 3.

[9] According to Wade, he walked into the residence to use the restroom and returned to the front door.  See PRDUMF No. 4; Pl.'s Depo. 40:8-16.

8

front door.  See DUMF No. 11; Williams Decl. at    ¶ 11; Finley Decl. at ¶ 13.  Officer Williams asked to speak with Wade, and Wade stepped outside.  Wade was acting very nervously[10] at that time.  See Williams Decl. at ¶ 11; Finley Decl. at ¶ 13.

Officer Williams advised Wade and White of the drinking infraction and asked for identification.  See DUMF No. 13; Williams Decl. at ¶ 11; Finley Decl. at ¶ 14.  White immediately presented his identification, which confirmed his identity as "Lamont White" and his date of birth.  See DUMF No. 14; Williams Decl. at ¶ 11; Finley Decl. at ¶ 15.  Wade, however, began looking away and hesitated when providing his name.  See DUMF 15; Williams Decl. at ¶ 11; Finley Decl. at 15. Wade responded he had no identification, but gave the name of "John Brison"[11] with a birth date of 8/28/80.  See DUMF No. 16; Williams Decl. ¶ 11; Finley Decl. at ¶ 15; Wilkin Decl. at ¶ 7.  Officer Finley ran a wants and warrants check for White and Brison.  White's name came back clear of any wants, but the name "Brison" did not return any matches for a driver's license.  See DUMF No. 20; Williams Decl. at. ¶ 12-18; Finley Decl. at ¶ 14-18. This caused the officers to become suspicious, and they began questioning Wade to determine whether he was telling the truth.[12]  See DUMF Nos. 21-22; Williams Decl. at. ¶ 16; Finley Decl. at ¶ 17; Wilkin Decl. at ¶ 7.  The officers requested a fingerprinting unit to respond to their location, but when it arrived the machine was not functioning properly.  See DUMF No. 30; Williams Decl. at ¶ 17; Finley Decl. at ¶ 21.  Wade told officers he lived around the corner at 442 W. Fir with his girlfriend, and he had an identification card at that location.[13]  See DUMF

---

[10] Wade maintains that he was ordered outside and disputes that he was at all nervous or acting nervously.  See PRDUMF No. 6; Pl.'s Depo. 43:3-5.  The Court will accept Wade's version of the facts for summary judgment purposes.

[11] Wade admits he had been going by the name "John Brison," because there was an outstanding warrant for his arrest.  See DUMF No. 17; Pl's. Depo. at 45:23-46:23; 48:8-12.

[12] Wade alleges Officer Williams told him he did not believe that at Wade's given age he had not had any prior police contact, and that he hated liars.  See Pl.'s Decl. at ¶ 8.

[13] According to Defendants, Wade sent an unidentified male juvenile to 442 W. Fir to retrieve Wade's identification card, and the juvenile returned with a torn-up Social Security card bearing the name "John Brinson."  See Williams Decl. at ¶ 13; Finley Decl. at ¶ 19; Wilkin Decl. at ¶ 8.  At his deposition, Wade stated he did not recall sending someone to get the identification card, but he admitted that his uncle's name was John Brinson, and he had been going by that name.  See Pl.'s Depo. at 47:13-48:16.

No. 23; Pl.'s Decl. at ¶ 5; Williams Decl. at ¶ 13; Finley Decl. at ¶ 18; Wilkin Decl. at ¶ 8.

Wade maintains Officer Williams told him he needed to take Wade into custody to run a fingerprint check, and he would have to be handcuffed as part of standard procedure.  See Pl.'s Decl. at   ¶ 9.  Wade alleges he submitted to handcuffs and the officers put him inside their patrol car.  See PRDUMF No. 7; Pl's Decl. at ¶ 10.  The officers claim that when they informed Wade of the need to take him to the investigations bureau for fingerprinting, Wade responded, "Take me to my house and ask my girlfriend."  See Williams Decl. at ¶ 18; Finley Decl. at ¶ 20; Wilkin Decl. at ¶ 9.  Then, the officers contend, Wade voluntarily got into the backseat of Williams' and Finley's patrol car, without handcuffs, and they drove to the 442 W. Fir residence.  See Williams Decl. at ¶ 19-20; Finley Decl. at ¶ 22-23; Irving Decl. at ¶ 8.  Wade agrees he was driven to his girlfriend's house.  See Pl.'s Decl. at ¶ 10.  On summary judgment, the Court views the facts in the light most favorable to Mr. Wade and assumes he was handcuffed and driven to 442 W. Fir.

Upon arrival, Officer Williams went to the front door of the residence and knocked several times, attempting to make contact with Wade's girlfriend, but there was no answer.  See DUMF No. 35; Williams Decl. at ¶ 19-20; Finley Decl. at ¶ 22-23; Irving Decl. at ¶ 8.  Officer Irving ran a computer search for prior calls for service at the 442 W. Fir address, and came across the name "Deon" as a person associated with the residence.  See DUMF No. 28; Irving Decl. at ¶ 38.  Officers Finley and Williams then returned to the patrol car and opened the rear doors.  See Pl.'s Decl. at ¶ 12; Finley Decl. at ¶ 26-27.  Officer Williams informed Wade, now calling him "Deon,"[14] of the need to identify him so they could issue a citation, and that meant transporting him to the investigations bureau for fingerprinting.  See Williams Decl. at ¶ 23-24; Finley Decl. at 26-28; Wilkin Decl. at ¶ 16.  Wade attempted to protest and began yelling for his girlfriend to come out of the house.  See Pl.'s Decl. at ¶ 13; Williams Decl. at ¶ 24; Finley Decl. at 28; Wilkin

---

[14] Wade claims he was never referred to as "Deon."  See PRDUMF No. 8.  He alleges that Officers Williams and Finley used harsh language, and said, "Now here's where the games end."  See Pl.'s Decl. at ¶ 12.  For the purposes of summary judgment, the Court will accept Wade's version of events.

Decl. at 15. Wade also started kicking and punching the interior of the patrol car. See DUMF
No. 39; Williams Decl. at ¶ 24; Wilkin Decl. at ¶ 15; J. Sandoval Decl. at 29:1-30:7; C. Sandoval
Depo. at 27:2-16. Wade continued screaming for his girlfriend. See DUMF No. 41; Pl.'s Decl.
at ¶ 14; Finley Decl. at ¶ 28; Williams Decl. at ¶ 15; Irving Decl. at ¶ 11. Officers repeatedly told
Wade to calm down and tried to talk to him, but he continued kicking the window of the patrol
car. See DUMF Nos. 42-43; C. Sandoval Depo. at ¶ 23:14-23; 26:20-27; 27:2-19. Wade alleges
Officers Williams and Finley told him he was going to jail for assault on a police officer. See
Pl.'s Decl. at ¶ 14. Neighbors who witnessed the incident testified that Wade's hands were free
at this time. See C. Sandoval Depo. at 28:16-22; Reynolds Depo. at 16:15-19. However, Wade
maintains he was still in handcuffs in the backseat of the patrol car. See PRDUMF No. 14; Pl.'s
Decl. at ¶ 17. For summary judgment purposes, the Court will accept Wade's version of events.

Defendants contend Officers Williams and Wilkin attempted to place handcuffs on Wade
and advised him that he would be cited and released from the Fresno Police Department Crime
Scene Bureau for the minor violations of drinking in public and providing a false name. See
Williams Decl. at ¶ 25; Wilkin Decl. at ¶ 16; Finley Decl. at ¶ 28; Irving Decl. at ¶ 11. Wade
refused to comply and became increasingly agitated. See Finley Decl. at ¶ 29; Wilkin Decl. at ¶
17. Officers Williams and Wilkin attempted to place Wade in a control hold . See Williams
Decl. at ¶ 26; Wilkin Decl. at ¶ 18; Finley Decl. at ¶ 28; Irving Decl. at ¶ 12. Wade alleges that
he was punched in the face and choked by Officer Finley while still in handcuffs and in the
backseat of the patrol car. See Pl.'s Decl. at ¶ 17. Wade contends he was in shock and fear and
nearly unconscious from being choked, when he felt his entire body burning and realized that
Officer Finley was tasing him.[15] See Pl.'s Decl. at ¶ 18. Wade did not hear any of the officers

---

[15] Defendants' version of events is somewhat different. Officer Finley claims he was
holding onto Wade's shirt and trying to pull him forward so Wade would put his hands behind
his back for Officer Williams. See Finley Decl. at 31. Officer Finley advised Wade if he did not
comply, he would use his taser, but Wade became increasingly agitated, tensing up his arms so he
could not be handcuffed. See Finley Decl. at 30. Officer Finley then removed his taser and
activated it, attempting to gain compliance by letting Wade hear the noise from the taser, but
Wade continued to resist. See Finley Decl. at ¶ 31; Wilkin Decl. at ¶ 19; Williams Decl. at ¶ 27;
Irving Decl. at ¶ 13. Officers Williams and Wilkin released their control hold, and Officer Finley
applied a contact tase to the left side of Wade's back. See Finley Decl. at ¶ 32; Wilkin Decl. at ¶
20; Williams Decl. at ¶ 33. For summary judgment purposes, the Court will credit Wade's

warn him before Officer Finley applied the taser.  See Pl.'s Depo. at 58:17-20.

Defendants allege Officer Finley's deployment of the taser had no effect, and Wade jumped out of the backseat of the patrol car, swinging his fists in a threatening manner at Officers Williams, Wilkin, and Sergeant Beer.  See Finley Decl. at ¶ 32; Wilkin Decl. at ¶ 20; Irving Decl. at ¶ 14; Williams Decl. at ¶ 28.  Wade disputes this account, claiming he was pulled from the patrol car by Officers Williams and Wilkin.  See Pl.'s Decl. at ¶¶ 19-20.  Wade then ran from Defendants toward his girlfriend's house, and Defendants chased after him giving him commands to stop.  See DUMF Nos. 62-63.  Wade contends Officer Williams kicked him in the back, but Wade was somehow able to maintain his balance and tried to move to safety on the other side of the house, while screaming for his girlfriend.  See PRDUMF No. 18.  Wade alleges Officers Williams, Wilkin, Irving and Finley pushed him to the ground, Officer Wilkin kicked him in the ribs,[16] and he then felt a barrage of kicks and punches by the officers.  See PRDUMF No. 19; Pl.'s Decl. at ¶¶ 22-23.  Wade again felt his body burning, presumably from being tased, and then blacked out.  See PRDUMF No. 18.

Defendants provide more detailed account of the final moments of the incident. According to Defendants, Officer Finley lost his footing while he was chasing Wade and fell to the ground, causing the cartridge from his taser to break off.  See DUMF No. 69.  Officer Finley then caught up to Wade, and Wade took a fighting stance toward him.  See DUMF No. 71. Officer Finley advised Wade that he was going to use his taser.  See DUMF No. 72.  Officer Wilkin arrived to assist,[17] and pushed Wade into a fence, but Wade began throwing violent punches.  See DUMF No. 75-76.  Officer Wilkin contends that the swiftness of Wade's attack did not allow him time to use his department-issued weapons, and so he struck Wade in the area

_____

account that he was tased while still handcuffed in the backseat of the patrol car.

[16] Officer Wilkin acknowledges that he did not want himself or another officer to be struck by one of Wade's punches, so he struck Wade with the top of his right foot in his right rib cage.  See Wilkin Decl. at ¶ 32; Pl.'s Decl. at ¶ 21.

[17] Officer Wilkin saw Officer Finley fall and knew his taser had broken.  See DUMF No. 75.

12

of his right eye.  See DUMF No. 78-79.  Officer Irving yelled out, "Taser, Taser, Taser!" and deployed his department-issued X26 taser in dart mode at Wade's center mass.[18]  See Williams Decl. at ¶ 33; Finley Decl. at ¶ 38; Wilkin Decl. at ¶ 27; Irving Decl. at ¶ 20.  Once the first five-second taser cycle ended, Defendants contend Wade began punching and kicking at Officers Finley and Wilkin as they attempted to place handcuffs on him.  See DUMF No. 85.  Officer Irving cycled the taser for another five seconds, which momentarily caused Wade to stop kicking and punching.  See DUMF No. 84.  But Wade again started punching and kicking toward the officers, and they again directed him to stop resisting and put his hands behind his back.  See DUMF No. 84-85.  Wade, however, continued to resist, and Officer Irving cycled the taser for a third and final five-second cycle.  See DUMF No. 87.  At this point, the officers claim they were able to place handcuffs on Wade, and called for an ambulance to treat him for the taser applications.[19]  Defendants arrested Wade for two counts of battery on a police officer, four counts of resisting arrest by force, providing false information to a police officer to prevent arrest, and drinking in public.  See DUMF No. 89; Williams Decl. at ¶37; California Penal Code §§ 243(C)(2), 69, 148(A)(1), and 148.9; and Fresno Municipal Code § 8-120.

## II. SUMMARY JUDGMENT STANDARD

    Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

---

    [18] Wade denies hearing any officer shout, "Taser!" or warn him that he was about to be tased.  See Pl.'s Depo. at 63:7-11.

    [19] Defendants contend Wade admitted to having smoked marijuana laced with PCP, and stated that was why he resisted so violently.  See DUMF No. 92.  Wade denies being under the influence of PCP, and denies telling the officers that he was.  See Pl.'s Depo. at 75:16-19.  One of the paramedics who arrived on the scene testified that Wade refused to cooperate and struggled as they tried to move him.  See Dukes Decl. at 30:9-25  The paramedic testified that Wade "definitely was not acting the way a normal person would act," and reported a medical history of paranoid schizophrenia.  Id. at 18:16-19:6.  After Wade was taken into custody, Defendants allege he made statements like, "I don't wanna die. I don't wanna die. Please don't kill me."  See DUMF No. 94.  Officer Finley tried to explain they were just trying to take him into custody, but Wade refused to listen and said, "You guys were going to kill me. I don't want to die."  See Finley Decl. at ¶ 43.

1    Columbia Broadcast System, 368 U.S. 464, 467 (1962);  Southern California Gas Co. v. City of

2    Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).  Under summary judgment practice, the moving

3    party:

> 4    [A]lways bears the initial responsibility of informing the district court of the basis for its
>      motion, and identifying those portions of "the pleadings, depositions, answers to
> 5    interrogatories, and admissions on file, together with the affidavits, if any," which it
>      believes demonstrate the absence of a genuine issue of material fact.
> 6

7    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Miller v. Glenn Miller Productions, Inc., 454

8    F.3d 975, 987 (9th Cir. 2006).  A fact is material if it could affect the outcome of the suit under

9    the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10   Miller, 454 F.3d at 987.  "[W]here the nonmoving party will bear the burden of proof at trial on

11   a dispositive issue, a summary judgment motion may properly be made in reliance solely on the

12   'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.; Fortyune v.

13   American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  Indeed, summary judgment

14   should be entered, after adequate time for discovery and upon motion, against a party who fails to

15   make a showing sufficient to establish the existence of an element essential to that party's case,

16   and on which that party will bear the burden of proof at trial.  Celotex Corp. 477 U.S. at 322;

17   Miller, 454 F.3d at 987.  "[A] complete failure of proof concerning an essential element of the

18   nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. 477 U.S. at

19   322.  In such a circumstance, summary judgment should be granted, "so long as whatever is

20   before the district court demonstrates that the standard for entry of summary judgment, as set

21   forth in Rule 56(c), is satisfied."  Id. at 323.

22        If the moving party meets its initial responsibility, the burden then shifts to the opposing

23   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

24   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities

25   Serv. Co., 391 U.S. 253, 288-89 (1968); Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,

26   Inc.,210 F.3d 1099, 1103 (9th Cir. 2000).   The opposing party cannot "'rest upon the mere

27   allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific

28   facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records,

515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)); Miller, 454 F.3d at 987.

In attempting to establish the existence of this factual dispute, the opposing party is required to

tender evidence of specific facts in the form of affidavits, and/or admissible discovery material,

in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11;

First Nat'l Bank, 391 U.S. at 289; Miller, 454 F.3d at 987.  The opposing party must demonstrate

that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under

the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cline v. Industrial

Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000), and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, Anderson, 477 U.S. 248-49; In re Caneva, 550 F.3d 755, 761 (9th Cir. 2008);

Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1144 (9th Cir. 2006).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." First Nat'l Bank, 391 U.S. at 290;  Giles v. General Motors Acceptance Corp., 494 F.3d

865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings

and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475

U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments);

International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the Court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Rule 56(c); Poller, 368 U.S. at 468; Price v. Sery, 513 F.3d 962, 965 n.1 (9th Cir. 2008);

Lockett v. Catalina Channel Exp., Inc., 496 F.3d 1061, 1064 (9th Cir. 2007).  "[I]n ruling on a

motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all

justifiable inferences are to be drawn in that party's favor.'" Hunt v. Cromartie, 526 U.S. 541,

552 (1999) (quoting Anderson, 477 U.S. at 255); Miller, 454 F.3d at 987; Stegall v. Citadel

Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Finally, to demonstrate a genuine issue, the

opposing party "must do more than simply show that there is some metaphysical doubt as to the

1   material facts. . . .   Where the record taken as a whole could not lead a rational trier of fact to find

2   for the nonmoving party, there is no 'genuine issue for trial.'"   <u>Matsushita</u>, 475 U.S. at 587

3   (citation omitted).

4        Additionally, the Court has the discretion in appropriate circumstances to consider

5   materials that are not properly brought to its attention, but the Court is not required to examine

6   the entire file for evidence establishing a genuine issue of material fact where the evidence is not

7   set forth in the opposing papers with adequate references.   <u>See</u> <u>Southern Cal. Gas Co. v. City of</u>

8   <u>Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237

9   F.3d 1026, 1031 (9th Cir. 2001).

10       ### III. <u>DEFENDANTS' MOTION</u>

11

12   A.     **Defendants' Argument**

13       Defendants contend they made a lawful initial stop and detention on suspicion of drinking

14   in public.   Wade's conduct upon being asked for identification raised red flags for Officers

15   Williams and Finley, and they suspected he was lying about his identification.   Defendants

16   maintain that Wade voluntarily entered the backseat of the patrol car to be driven to his

17   girlfriend's home for the purpose of obtaining his identification card.   Wade was agitated and

18   began kicking, screaming, and flailing in the backseat of the police car.   Defendants then decided

19   to take Wade into custody for fingerprinting with the intention of citing him for a minor

20   infraction and releasing him.   Defendants argue their attempt to place handcuffs on Wade during

21   transport was reasonable due to Wade's violent behavior.   Multiple taser applications were used

22   because each prior application was unsuccessful and Wade managed to overcome Defendants'

23   efforts to subdue him. Wade's Fourth and Fourteenth Amendment rights were not violated

24   because the force used to effectuate Wade's arrest was in self defense and defense of others.

25   Moreover, Defendants contend, the governmental interest in arresting and bringing to justice

26   individuals who intentionally evade law enforcement outweighs any intrusion on Wade's rights.

27        Alternatively, Defendants argue that even if there was a violation of Wade's

28   Constitutional rights, they are entitled to qualified immunity because their use of force was

16

objectively reasonable under the circumstances.  Defendants argue that each officer is entitled to qualified immunity:

Defendants Williams and Finley are entitled to qualified immunity for initiating contact with Wade, relocating him to his girlfriend's house at his request, placing him under arrest for his violations, and for the minimal force used in defending themselves against Wade's violent attacks on them.

Defendant Finley is also entitled to qualified immunity for his contact taser application on Wade in the back seat of his patrol car because a reasonable officer in Officer Finley's position could believe Wade was actively resisting, delaying, and obstructing officers in performance of their duties, and that reasonable restraint was used to get Wade to submit to handcuffs.

Defendant Wilkin is entitled to qualified immunity for his use of force on Wade in order to defend himself.  A reasonable officer in Officer Wilkin's position could believe Wade was actively resisting with force and violence and committing battery on officers, thereby requiring the amount of force used to get Wade to submit.

Defendant Irving is entitled to qualified immunity for his act of deploying his taser on Wade.  Based on the circumstances, a reasonable officer in his position could believe that Wade was attacking his fellow officers and they needed assistance.  Defendant Irving observed Wade resisting with force and violence, committing battery on officers, taking officers on a foot pursuit, and disobeying orders.  This required multiple applications of the taser.

Defendants argue that even if any of the officers were mistaken in their belief that the amount of force used was legal, the mistake was reasonable under the circumstances and they are still entitled to qualified immunity.

**B. Plaintiff's Opposition**

Wade disputes Defendants' account of the facts and alleges Defendants used excessive force.  Wade alleges he was handcuffed and yelling for his girlfriend out of fear when Defendants Williams and Finley opened the rear doors of the patrol car and started shouting at him.  Wade

alleges Defendant Finley punched him in the face, choked him, and then tased him. Wade alleges this violated his constitutional right to be free from excessive force.

Wade further contends he ran from Defendants in fear for his life, with his hands still handcuffed behind his back. In response, Defendant Williams kicked him in the back. Wade continued to run, and he was pushed to the ground by one of the Defendants. He contends he was surrounded by all four Defendants, who began kicking and punching him in the face and head. Wade alleges he was tased again. Wade argues this use of force also amounts to a constitutional violation.

**C.    Legal Standards**

1.    Excessive Force

The Fourteenth Amendment's Due Process clause protects pretrial detainees from the use of excessive force that amounts to punishment. See Graham v. Connor, 490 U.S. 386, 395 n.10 (1989); Gibson v. City of Washoe, Nev., 290 F.3d 1175, 1197 (9th Cir. 2002). The Supreme Court has determined that "the Fourth Amendment sets the 'applicable constitutional limitations' for considering claims of excessive force during pretrial detention." Gibson, 290 F.3d at 1197. Thus, all claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen should be analyzed under the Fourth Amendment and its standard of objective reasonableness. See Craver v. Allbee, 324 Fed. Appx. 597, 597 (9th Cir. 2009); Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). The pertinent question in an excessive force case is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).

Determining whether a specific use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007). "We first assess

the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." Davis, 478 F.3d at 1054.  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.  Further, where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed.  See Drummond, 343 F.3d at 1058.  "In some cases . . ., the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Drummond, 343 F.3d at 1058.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Drummond, 343 F.3d at 1058.  Since "[n]ot every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment," Graham, 490 U.S. at 396, "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force." Blankenhorn, 485 F.3d at 477.  "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).  When the circumstances show that there is no need for force, any force used is constitutionally unreasonable.  See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

      2.    Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" in their individual capacities. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The "concern of the immunity

1   inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult

2   for an officer to determine how the relevant legal doctrine will apply to the factual situation that

3   he faces." Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002) (citation

4   omitted).  This is why the rule of qualified immunity "provides ample protection to all but the

5   plainly incompetent or those who knowingly violate the law." Id. at 1043 (quoting Saucier v.

6   Katz, 533 U.S. 194, 202 (2001)).  A public official is entitled to qualified immunity if the law

7   governing the official's conduct was not clearly established, or if under clearly established law he

8   could have reasonably believed that his conduct was lawful. Jeffers v. Gomez, 267 F.3d 895, 910

9   (9th Cir.2001); Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).  The defendant

10  bears the burden of establishing qualified immunity. Crawford-El v. Britton, 523 U.S. 574, 586-

11  87 (1998).

12      A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

13  Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

14  Cir. 2006); Brittain v. Hansen, 451 F.3d 982, 987 (9th Cir. 2006).  However, lower courts need

15  not strictly follow the tiered sequence in analyzing qualified immunity, but instead may dispose

16  of the issue at step two without addressing step one.  Pearson v. Callahan, 129 S.Ct. 808, 821

17  (2009); Moss v. United States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).  Under the

18  first step, the court determines whether, "taken in the light most favorable to the party asserting

19  the injury, do the facts show the officer's conduct violated a constitutional right?" Saucier, 533

20  U.S. at 201; Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Skoog, 469 F.3d at 1229.  If

21  the answer is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes,"

22  the court continues the analysis.  See Saucier, 533 U.S. at 201; Blankenhorn v. City of Orange,

23  485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir.

24  2003).

25      Under the second step, the court determines "whether the right was clearly established,"

26  and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th

27  Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is

28  whether "the contours of the right were sufficiently clear that a reasonable official would

20

understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079.  Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Skoog, 469 F.3d at 1229-30.  In making this determination, the court considers the state of the law at the time of the alleged violation, but it is unnecessary for the precise conduct in question to have been previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . .irrelevant." Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a reasonable officer could have believed [the action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed.'" Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.

## IV. DISCUSSION

In this case, there are multiple uses of force by multiple officers.  Because Wade's complaint alleges two separate incidents of excessive force, the Court will analyze Defendants' conduct with respect to each incident separately.  On a motion for summary judgment the Court must draw all reasonable inferences in favor of the non-moving party.  "Because the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" Torres v. City of Madera, 648 F.3d 1119, 1125 (9th Cir. 2011) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002)).

**A.    Incident #1 - Defendants Williams, Wilkin, and Finley**

1.    Excessive Force

Wade alleges he was already handcuffed behind his back and sitting in the patrol car when Defendants Williams and Finley opened the rear doors.  Wade claims he was calling for his girlfriend in a state of fear.  Defendants allege, and Wade does not dispute, that he was also kicking or punching the interior of the patrol car.  Wade claims Defendants Finley and Williams became increasingly agitated and verbally abusive toward him.  Defendants acknowledge that Defendants Williams and Wilkin attempted to place Wade in a control hold.[20]  Wade alleges Defendant Finley choked and punched him, and then used a taser on him.  The Court will apply the Graham factors to determine whether the amount of force used by Defendant Finley was excessive.

First, the quantum of force at issue in the first incident is choking, punching, and the application of a taser device in the "drive stun," or direct contact, mode.  Choking and punching are broadly characterized as non-lethal levels of force, though both may be employed in a manner that creates a substantial risk of death or serious bodily injury.  See Bryan v. McPherson, 630 F.3d 805, 825 n.7 (9th Cir. 2010).  Here, any hands-on force appears to have been relatively low level force, as it did not subdue Wade.  While the use of a taser in dart mode represents an intermediate force option, the Ninth Circuit has quantified the use of a taser in drive stun mode as "less than the intermediate" quantum of force.  Brooks v. City of Seattle, 599 F.3d 1018, 1028 (9th Cir. 2010).

Second, at the time of the first application of force, Defendants were in the process of investigating a minor infraction for public drinking and suspected Wade had given a false name.  Their suspicions were confirmed when Defendant Irving discovered the name "Deon" associated with the residence where Wade said he lived.  See Cal. Pen. Code § 148(a).  Under California Penal Code section 853.5(a), in order to issue a citation for drinking in public, Defendants

_____

[20] Wade does not address the control hold used by Defendants Williams and Wilkin, and therefore the Court will not consider it part of the basis for Wade's excessive force claims.

needed Wade's identification.[21]   A reasonably prudent person would have believed Wade was delaying the officers' investigation by providing a false name in violation of California Penal Code sections 148(a) and 148.9.  Therefore, Defendants had probable cause to arrest Wade.  The crimes potentially at issue were infractions or misdemeanors,[22] not felonies, and cannot, by themselves, justify the use of significant force.  See Bryan, 630 F.3d at 829.

Third, at the time of the first incident, it appears Wade posed some threat to the safety of Defendants or third parties.  When Wade continued refusing to give his real name and became increasingly agitated, kicking and shouting for his girlfriend, Defendants reasonably believed an arrest was indicated.  But at this point, Wade was already handcuffed,[23] there was no indication that Wade was attempting to flee, no weapons were visible on Wade, and the potential crimes involved were not violent.  The threat to safety of the officers at the time Officer Finley used physical force and applied the taser was therefore minimal.

Fourth, at the time the force was applied, there was no evidence of active evasion or flight that would justify the use of non-deadly force.  See Miller v. Clark County, 340 F.3d 959, 965-66 (9th Cir. 2003).

---

[21] "[I]n any case in which a person is arrested for an offense declared to be an infraction, the person may be released according to the procedures set forth by this chapter for the release of persons arrested for an offense declared to be a misdemeanor. In all cases. . . in which a person is arrested for an infraction, a peace officer shall only require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear. If the arrestee does not have a driver's license or other satisfactory evidence of identity in his or her possession, the officer may require the arrestee to place a right thumbprint, or a left thumbprint or fingerprint if the person has a missing or disfigured right thumb, on the notice to appear. . . .Only if the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." Cal.Penal Code § 853.5(a).

[22] Willfully resisting, delaying, or obstructing a peace officer is a misdemeanor that carries a maximum $1,000 fine.  See Cal. Pen. Code § 148(a).  Giving a false name to a peace officer for purposes of evasion is a misdemeanor.  See Cal. Pen. Code § 148.9.  Drinking in public is an infraction.  See Fresno Municipal Code § 9-2503.

[23] The Court notes that there is a genuine dispute whether Wade was handcuffed.

Fifth, there was some indication that Wade was mentally ill or emotionally unstable.[24]  He was repeatedly screaming in fear for his girlfriend, despite the officers' assurances that they merely needed his identification in order to issue a citation.  As the Ninth Circuit has stated:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis.

See Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003) (quoting Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (9th Cir. 2001)).

Sixth, Defendant Finley gave no warning about the taser.[25]  There is no indication that a warning would have been impractical, and such warnings should be given when feasible.  See Deorle, 272 F.3d at 1284.

Seventh, neither Wade nor Defendants' police practices expert has identified an alternate technique available to Defendant Finley other than the low to intermediate force options used: verbal commands, hands-on force, and taser.  Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005).  If, however, Wade was handcuffed to the rear, Defendants' police practices expert has opined that would "influence any competent evaluation of the force applications used by the arresting officers as the scenario continued."  See Callanan Decl. at 12.

In light of the above factors, and viewing the evidence in the light most favorable to Wade, the Court concludes that the evidence supports more than one reasonable inference, and that a reasonable jury could find a Fourth Amendment violation.  The crimes involved were non-violent misdemeanors or infractions, Wade posed only a minor threat to the officers or third

---

[24] Indeed, Wade had been diagnosed with paranoid schizophrenia in 2000, and Defendants themselves suspected Wade was under the influence of a controlled substance, or had a serious mental health issue.  See Williams Decl. at ¶ 42; Finley Decl. at ¶ 48; Irving Decl.at ¶ 28; Wilkin Decl. at ¶ 28; Pl.'s Depo. 12:9-11, 14:4-8.

[25] The Court notes that there is a genuine dispute whether Defendant Finley gave a warning before deploying the taser.

1    persons, Wade appeared to be mentally unstable or under the influence of a controlled substance,

2    and there was no warning before the application of the taser.  There is no dispute of fact that

3    Wade exhibited non-compliant behavior by refusing to provide his true name, kicking, yelling,

4    and generally causing a disturbance.  But if Wade was in fact already handcuffed, a reasonable

5    jury could find that a lesser quantum of force than choking, punching, and tasing would have

6    been needed to gain compliance.[26]  Thus, if a jury were to credit Wade's version of events, it

7    could reasonably find that Defendant Finley's use of force - both hands-on force and the taser

8    application -  in this situation violated Wade's right to be free from excessive force.  Because

9    there remain genuine material facts in dispute on which a jury could make such a finding, Wade

10   has properly alleged the violation of a constitutional right.  Summary judgment on the issue

11   whether Defendant Finley violated Wade's Fourth Amendment rights will be denied as to the

12   first incident.

13          2.      Qualified Immunity

14          Having found that Wade's version of the facts prohibits summary judgment on whether

15   the Fourth Amendment was violated with respect to the first incident at issue, the Court will

16   proceed to determine whether Defendant Finley is entitled to qualified immunity because the law

17   was not clearly established as of April 25, 2008.  After reviewing the case law, the Court

18   concludes that, as of April 25, 2008, the law was not clearly established that a reasonable officer

19   in Defendant Finley's position would know that using low level hands-on force and a taser in

20   drive stun mode on a resisting, handcuffed arrestee was unconstitutional.

21          As discussed above, use of a taser in drive stun mode is a less than intermediate level of

22   force.  Tasers are designed to cause temporary immobilization, most often in order to secure

23   handcuffs.  See Brooks, 599 F.3d at 1030-31.  The Ninth Circuit and this Court recently held that

24   the law regarding tasers was not sufficiently clearly established to warrant denying officers

25   qualified immunity, under the facts of the respective cases.  See Mattos v. Agarano, 661 F.3d

26   433, 452 (9th Cir. 2011) (law not clearly established as of November 2004 or August 2006);

27

28
           [26] Defendants' police practices expert admits as much in his report.

25

1   Azevedo v. City of Fresno, 2011 WL 284637, at * 10 (E.D. Cal., Jan. 25, 2011) (law not clearly

2   established as of November 7, 2007).  But neither of these cases involved the use of force against

3   a handcuffed suspect, nor have the parties cited any such cases.

4          Some case law on this issue did, however, exist at the time of Wade's arrest on April 25,

5   2008.  In several published and unpublished cases, district courts have found that the use of a

6   taser or other non-deadly force is clearly unlawful where the arrestee is already handcuffed and is

7   not resisting arrest in any way.  See Galvez v. Bruce, 552 F.3d 1238, 1245 (11th Cir. 2008)

8   ("Given the state of the law in 2004, it should have been clear to [the defendant officer] that

9   repeatedly slamming a fully secured and compliant [plaintiff] against the corner of a concrete

10  wall, with force sufficient to break [plaintiff's] ribs and cause a leaking aneurysm was

11  unlawful."); Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008) (holding that as of 2005 it was

12  clearly established that using a taser on a handcuffed arrestee who was not endangering herself or

13  others was not objectively reasonable); Michaels v. City of Vermillion, 539 F. Supp. 2d 975, 990

14  (N.D. Ohio, February 22, 2008) (holding that it would be clear to a reasonable officer that tasing

15  an arrestee who has been handcuffed and is neither a safety nor a flight risk was unlawful);

16  Wanbaugh v. Fields, 508 F. Supp. 2d 723, 730 (W.D. Ark. 2007) ("We believe the state of the

17  law gave the officers fair warning that the alleged repeated deployment of a stun gun on an

18  unarmed arrestee, including one time after he was handcuffed, was unconstitutional."); Richards

19  v. Janis, 2007 WL 3046252, at *6 (E.D. Wash., Oct. 17, 2007) (holding that "the law at the time

20  of Officer Cavin's conduct clearly established that a taser must not be used against a non-

21  resisting [handcuffed] individual."); Sleeman v. Oakland County, 2007 WL 1343403, at *7 (E.D.

22  Mich. May 7, 2007) ("[I]t is clearly established that tasing an individual who is not resisting and

23  poses no threat, especially after he is restrained, violates the Fourth Amendment.");  Batiste v.

24  City of Beaumont, 426 F.Supp.2d 395, 402 (E.D. Tex. 2006) (finding that choking and

25  repeatedly using a taser device against a docile and compliant person constituted an

26  unconstitutional "wanton and unnecessary infliction of pain" and amounted to excessive and

27  unreasonable force); DeSalvo v. City of Collinsville, 2005 WL 2487829, at *5 (S.D. Ill. Oct. 7,

28  2005) (finding that "a reasonable officer in Krug's position would have known that it would be

26

1   unlawful to tase [the plaintiff]" who was not physically resisting or struggling in any way);

2   By contrast, in cases where a handcuffed arrestee is struggling or resisting, courts have

3   found that use of force, including a taser, may be constitutionally appropriate.  See Sanders v.

4   City of Dothan, 409 Fed. Appx. 285, (11th Cir. 2011) (finding that as of August 24, 2005 the law

5   was not clearly established that an officer violated a constitutional right by using a taser on an

6   arrestee while he was handcuffed in the back of a patrol car to prevent him from swallowing

7   contraband); Buckley v. Haddock, 292 Fed. Appx. 791, 787, 2008 WL 4140297, at *6 (11th Cir.

8   2008) (holding that, as of March 2004, it was not clearly unlawful to use a taser to get a non-

9   compliant, handcuffed suspect off the ground and into a patrol car after a traffic stop);

10  Zivojinovich v. Barner, 525 F.3d 1059, (11th Cir. 2008) (finding that defendant officer did not

11  use excessive force by deploying a taser against a handcuffed arrestee who was intentionally

12  spraying blood at the officer through his broken nose), Yarnall v. Mendez, 509 F. Supp. 2d 421,

13  433 (D. Del. 2007) (holding that it was reasonable and necessary for defendant officers to use

14  taser and physical force against a fleeing, handcuffed suspect);  Rose v. City of Lafayette, 2007

15  WL 485228, at * 6 (D. Colo. 2007) (finding that a reasonable officer would not have had "fair

16  notice" that it was objectively unreasonable to use a taser on a handcuffed arrestee in detention

17  who had kicked an officer), Johnson v. City of Lincoln Park, 434 F.Supp.2d 467, (E.D. Mich.

18  2006) (holding that use of a taser on a handcuffed, resisting, struggling, unarmed 14-year-old

19  suspect was objectively reasonable), Carroll v. County Trumbull, 2006 WL 1134206, *13 (N.D.

20  Ohio, Apr. 25, 2006) (granting qualified immunity to officer who used taser on a kicking,

21  resisting, handcuffed arrestee); Wilkomm v. Mayer, 2006 WL 582044, at *4 (W.D. Wis., Mar. 9,

22  2006) (holding that as a reasonable officer could have believed it was constitutional to use a taser

23  to gain compliance from a belligerent, handcuffed arrestee); Devoe v. Rebant, 2006 WL 334297,

24  at *7 (E.D. Mich. 2006) (finding that it was objectively reasonable for defendant officer to use

25  taser on handcuffed plaintiff who would not get into the officer's patrol car).

26  The Ninth Circuit recently held that, as of October 27, 2002, "few things in our case law

27  are as clearly established as the principle that an officer may not 'seize an unarmed,

28  nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the

fleeing suspect poses a threat of serious physical harm, either to the officer or to others.'"  See

Torres v. City of Madera, 648 F.3d 1119, 1128 (9th Cir. 2011).  In Torres, the defendant officer

mistook her semiautomatic pistol for her taser and shot and killed a handcuffed arrestee who was

kicking and yelling in the back of a patrol car. Id. at 1121.  The Ninth Circuit reversed this

Court's finding of qualified immunity, holding that "if a jury were to find Officer Noriega's

mistaken belief that she was holding her Taser rather than her Glock unreasonable, her use of

force in this situation was excessive and violated [the arrestee's] Fourth Amendment rights."  Id.

at 1127.  The Ninth Circuit made no specific finding, however, as to whether the law is clearly

established that using non-lethal force, such as a taser, against a struggling, handcuffed arrestee

violates the Fourth Amendment.

The Court has scoured the record, including Wade's deposition testimony, and can find

no evidence to contradict Defendants' assertion, supported by non-party witness testimony, that

Wade refused to comply with the officers' orders to calm down and was kicking the interior of

the police car while screaming for his girlfriend.  Thus, there is no genuine dispute that Wade

was resisting arrest.  A reasonable officer in Defendant Finley's position could have believed that

Wade's conduct presented some threat, however minimal, to the safety of Wade or the officers.

Given the state of the case law on April 25, 2008, the Court concludes that it was not clearly

established that a reasonable officer in Defendant Finley's position would know that the use of

hands-on force and a taser on Wade was unconstitutional.  Cf. Buckley, 292 Fed. Appx. at 787,

2008 WL 4140297, at *6; Carroll, 2006 WL 1134206, at *13.  The Court will grant Defendant

Finley qualified immunity for his use of force during the first incident.

**B.   Incident #2 - Defendants Williams, Finley, Wilkin, and Irving**

1.   Excessive Force

After Defendant Finley tased Wade in the back of the police car, Wade exited the car[27]

and began running from Defendants, while still handcuffed behind his back.  Officer Williams

kicked Wade in the back, but Wade recovered and continued his foot bail.  Defendants chased

---

[27] The Court notes there is a dispute whether Wade jumped from the patrol car himself or
was pulled out by Defendants Williams and Wilkin.

after him, and Defendant Wilkin pushed Wade into a fence and struck Wade on the right side of

his face.  Once Wade was on the ground, he was surrounded by all four Defendants who began

kicking and punching him.[28]  Defendant Irving warned Wade that he would deploy his taser if he

did not comply, and then deployed the taser in dart mode.  Defendant Irving cycled the taser three

times before Wade was subdued.  The Court will apply the Graham factors to determine whether

the amount of force used by each of the four Defendants was excessive.

First, the quantum of force at issue in the first incident is kicking, punching, and the

application of a taser device in dart mode.  Kicking and punching are broadly characterized as

non-lethal levels of force, though both may be employed in a manner that creates a substantial

risk of death or serious bodily injury.  See Bryan, 630 F.3d at 825 n.7.  The use of taser in dart

mode represents an intermediate force option.  See Brooks, 599 F.3d at 1028.

Second, Wade ran from Defendants, who were trying to effectuate his arrest for delaying

their investigation.  A reasonably prudent person would have believed Wade was attempting to

flee in an effort to evade arrest. As discussed above, Defendants already had probable cause to

arrest Wade.  The crimes potentially at issue were infractions or misdemeanors, and cannot, by

themselves, justify the use of significant force.  See Bryan, 630 F.3d at 829.  Once Wade

attempted to flee, however, Defendants had a duty to seize him.

Third, at the time of the second incident, Wade posed a threat to the safety of Defendants

or third parties.  He was handcuffed, but still managed to break away and run from the officers.

Although the underlying crimes at issue were nonviolent, Wade's foot bail presented a threat to

safety of the officers, who were forced to chase after him, and others who may have been in his

path.

Fourth, active evasion or flight by a non-felon[29] generally favors a police officer's use of

non-deadly force.  See Miller, 340 F.3d at 965-66.  During the second incident, Wade was in the

process of fleeing from Defendants.

---

[28] The Court notes that there is a dispute whether Wade was also kicking and punching at
Defendants.

[29] At the time of his arrest, Defendants were unaware that Wade was a felon.

1  Fifth, as discussed above, there was some indication that Wade was mentally ill or

2  emotionally unstable.  See Drummond, 343 F.3d at 1058.

3  Sixth, Defendant Irving gave no warning before deploying his taser in dart mode and

4  cycling it three times.[30]  There is no indication that a warning would have been impractical, and

5  such warnings should be given when feasible.  See Deorle, 272 F.3d at 1284.

6  Seventh, neither Wade nor Defendants' police practices expert has identified an alternate

7  technique available to Defendants to overcome Wade's attempt to flee, other than the

8  intermediate force options used.  See Smith, 394 F.3d at 703.  Again, however, if Wade was

9  handcuffed to the rear, Defendants' police practices expert has opined that would "influence any

10 competent evaluation of the force applications used by the arresting officers as the scenario

11 continued."  See Callanan Decl. at 12.

12 In light of the above factors, and viewing the evidence in the light most favorable to

13 Wade, the Court concludes that the evidence supports more than one reasonable inference, and

14 that a reasonable jury could find a Fourth Amendment violation.  There is no dispute that Wade

15 attempted to evade arrest by flight and thereby posed a potential threat to Defendants and others.

16 But Wade appeared to be mentally unstable or under the influence of a controlled substance, and

17 there was no warning before the application of the taser.  If Wade was in fact already handcuffed

18 and was not swinging at the officers, a reasonable jury could find that a lesser quantum of force

19 than kicking, punching, and three taser cycles would have been needed to gain compliance.

20 Thus, if a jury were to credit Wade's version of events, it could reasonably find that the

21 Defendants' use of force - both hands-on force and the taser applications -  in this situation was

22 excessive and violated Wade's right to be free from excessive force.  Because there remain

23 genuine material facts in dispute on which a jury could make such a finding, Wade has properly

24 alleged the violation of a constitutional right.  Summary judgment on the issue of whether

25 Defendants violated Wade's Fourth Amendment rights must be denied as to this incident.

26 / / /

27

28 [30] The Court notes that there is a genuine dispute whether Defendant Irving gave a
warning before deploying the taser.

2.    Qualified Immunity

Having found that Wade's version of the facts prohibits summary judgment on whether the Fourth Amendment was violated with respect to the second incident at issue, the Court will proceed to determine whether Defendants are entitled to qualified immunity because the law was not clearly established as of April 25, 2008.  After reviewing the case law, the Court concludes that, as of April 25, 2008, the law was not clearly established that a reasonable officer in Defendants' position would know that using non-lethal physical force and a taser in dart mode on a fleeing, handcuffed arrestee was unconstitutional.

As discussed above, case law at the time of Wade's arrest suggests that when handcuffed arrestee is resisting or fleeing, use of non-lethal force may be constitutionally appropriate.  See Miller, 340 F.3d at 965-66;  Sanders, 409 Fed. Appx. 285; Buckley, 292 Fed. Appx. at 787, 2008 WL 4140297, at *6;  Zivojinovich, 525 F.3d 1059; Yarnall, 509 F. Supp. 2d at 433;  Rose, 2007 WL 485228, at * 6; Johnson, 434 F.Supp.2d 467; Carroll, 2006 WL 1134206, *13; Wilkomm, 2006 WL 582044, at *4; Devoe, 2006 WL 334297, at *7.

Even when viewing the facts in the light most favorable to Wade, it is undisputed that he ran from Defendants and resisted arrest; it was reasonable and necessary for Defendants to use force to gain control of the situation.  An officer in each Defendant's position could reasonably have believed that Wade's flight presented a threat to the safety of Wade, the officers, or other bystanders.  Given the state of the case law on April 25, 2008, the Court concludes it was not clearly established that a reasonable officer in Defendant Irving's position would know that the use of a taser in dart mode on Wade was unconstitutional.  Cf. Buckley, 292 Fed. Appx. at 787, 2008 WL 4140297, at *6; Carroll, 2006 WL 1134206, at *13.  Similarly, the Court concludes it was not clearly established that an officer in each of the other three Defendants' positions would know that the use of non-lethal physical force on Wade was unconstitutional.  See Miller, 340 F.3d at 965-66.  The Court will therefore grant Defendants qualified immunity for their uses of force during the second incident.

/ / /

31

## V. CONCLUSION AND ORDER

Defendants move for summary judgment on the remaining excessive force claims against them. The evidence viewed in the light most favorable to Wade supports conflicting inferences regarding whether the Fourth Amendment was violated. Accordingly, the Court cannot grant summary judgment on the excessive force issue.

With respect to qualified immunity, case law at the time of Wade's arrest was not so clearly established that a reasonable officer in Defendants' position would have known that the use of non-lethal force, including a taser, on a resisting (or fleeing), handcuffed arrestee was unconstitutional. Therefore, the Court will grant Defendants qualified immunity.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment on the issue of excessive force is DENIED as to Defendants Frederick Williams, Bernard Finley, David Wilkin, and Haywood Irving.

2. Defendants' motion for summary judgment on the issue of qualified immunity is GRANTED as to Defendants Frederick Williams, Bernard Finley, David Wilkin, and Haywood Irving.


IT IS SO ORDERED.

Dated:    January 24, 2012    _____

CHIEF UNITED STATES DISTRICT JUDGE